NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 09-2908

———————————

UNITED STATES OF AMERICA

v.

RUSSELL CHRISTIE,

Appellant.

———————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-07-cr-00332-001)
District Judge:  Hon. Harold A. Ackerman*

———————————

Submitted Under Third Circuit LAR 34.1(a)
July 16, 2010

Before:  RENDELL, JORDAN, and GREENAWAY, JR., *Circuit Judges*.

(Filed: September 15, 2010)

———————————

OPINION OF THE COURT

———————————

———————————

   *Judge Harold A. Ackerman, a stalwart on the United States District Court for the District of New Jersey for more than thirty years, passed away on December 2, 2009.

JORDAN, *Circuit Judge*.

Russell Christie appeals the judgment of conviction and sentence entered by the United States District Court for the District of New Jersey after a jury found him guilty of various child pornography offenses. For the reasons that follow, we will affirm.

## I.        Factual Background

On September 3, 2008, a grand jury returned an eight-count second superceding indictment charging Christie with possession, receipt, and advertising of child pornography, in violation of 18 U.S.C. §§ 2251(d)(1)(A), 2252A(a)(2)(A), and 2252A(a)(5)(B). The indictment was the culmination of a two-year investigation into the website of the North American Man-Girl Love Association ("NAMGLA"), a site that featured a password-protected forum where users could post links to sexually explicit images and videos of children and comment on those materials.

### A.        *Investigation Culminating in Christie's Arrest*

The investigation began in November 2005 as the byproduct of an unrelated fraud investigation into Jerrod Lochmiller, who happened to be the administrator of the NAMGLA site. Lochmiller, who was a fugitive and on probation at all times pertinent to this case, contacted the United States Attorney's Office in Los Angeles through his attorney, George Buehler. Buehler indicated that, in exchange for the government's dropping fraud charges against Lochmiller, Lochmiller would, in turn, provide access to the NAMGLA website and information on its users. The U.S. Attorney's Office agreed

2

and referred the case to the Federal Bureau of Investigation ("FBI"), which assigned Special Agent Douglas MacFarlane as the primary case agent for the investigation.

Buehler furnished a user name and password, which MacFarlane then used to access restricted areas of the NAMGLA website. At trial, MacFarlane testified that the password-protected areas of the website contained three sections entitled the N Gallery, the Private Gallery, and the Private Lounge. In the N Gallery – which MacFarlane identified as an abbreviation for "Nude Gallery" – users could post links to other websites containing sexually explicit images and videos of children posing by themselves. The Private Gallery and Private Lounge sections of the website operated in a similar manner, except that the links posted in them typically contained images of children engaged in sexual acts with adults or with one another. MacFarlane testified that access to the site was free but that users were required to submit links to child pornography to the site moderators in order to obtain a username and password. During the course of the investigation, one such user, who went by the screen name "franklee," consistently posted links to new images and videos, and posted comments to the website. As a result of MacFarlane's investigation, the FBI undertook efforts to identify the users of the website.

Identifying the users proved difficult, due to the manner in which individual computers are identified when linked to the internet. Residential internet customers typically connect to the internet through an internet service provider ("ISP"). Each time a customer connects, the ISP assigns a unique identifier, known as an IP address, to the customer's computer terminal. Depending on the ISP, a customer's IP address can

3

change each time he logs on to the internet. ISPs retain for a finite period of time – usually thirty, sixty, or ninety days – records of the IP addresses that they assign to customers. IP addresses are also conveyed to websites that an internet user visits, and administrators of websites, like NAMGLA's, can see the IP addresses of visitors to their sites. However, site administrators do not possess information linking a given IP address to a particular person. That information is held by the ISPs.

The FBI initially attempted to obtain the IP addresses of visitors to the NAMGLA website from Lochmiller, but, because all communications between the FBI and Lochmiller were handled through Buehler, the information was too stale to be useful. By the time government agents got the IP addresses from Buehler, there was not enough time to subpoena customer identities from the ISPs before the ISPs had purged their records reflecting which IP addresses had been assigned to which customers. Accordingly, in April 2006, the FBI requested that Lochmiller give them administrator-level access to the NAMGLA website, which he did. With that higher level of access, the FBI was able to see the IP addresses associated with each user. MacFarlane then began monitoring the IP addresses that appeared on the NAMGLA site, and he ultimately identified approximately forty individual users. From there, he apparently acquired from the ISPs the identity of the users associated with the IP addresses.

One of those individuals was Christie, who posted to NAMGLA using the screen name "franklee." According to MacFarlane, Christie was one of the most prolific contributors to the NAMGLA site, having written more than 2,500 posts between October

4

2005 and July 2006.  As a moderator for the site, Christie enforced site rules and counseled less-experienced users about how to name and password-protect files to avoid detection by law enforcement authorities.  Christie's moderator-level access also gave him the ability to approve new member accounts.

On July 25, 2006, the FBI executed multiple search warrants as part of a coordinated "takedown" effort aimed at the website and many of its users.  FBI agents at Christie's residence seized over five-hundred CD-ROMs containing images of children engaged in sexually explicit conduct, printed images with similar content, and Christie's computer, the hard drive from which held over 250,000 graphics files, including "several thousand" images of child pornography.  Agents also seized five composition notebooks containing notes reflecting the type of content on various child pornography websites as well as instructions on how to access them.  The notebooks contained references to child pornography files that "franklee" had posted to the NAMGLA website, girls' names, child pornography search terms, websites used to upload child pornography, and Christie's notes on various pictures and websites.  In addition, agents discovered a collection of children's toys.

Special Agent John Bennett interrogated Christie following the search.  Christie, who was fifty years old at the time of trial and has no children, explained that he was employed as a school bus driver for elementary and middle-school students, and that he used the toys to pacify children who became boisterous while riding the bus.  Christie also admitted to submitting two particular posts to the NAMGLA website.  One was titled

"nine-year-old in a supermarket" and the other told of becoming sexually aroused while changing a baby's diaper.

B.     *Pretrial Motions and Trial*

Prior to trial, Christie made several pretrial motions, including a motion for an evidentiary hearing to determine whether the government's work with Lochmiller constituted outrageous conduct amounting to a violation of Christie's due process rights.[1] The District Court denied the motion, concluding that, at the pretrial stage, the government's conduct did not raise sufficient concern to warrant a hearing. Additionally, in a *pro se* motion to suppress, Christie argued that the government violated his Fourth Amendment rights by obtaining his IP address without first acquiring a search warrant. The District Court rejected that argument, holding that Christie lacked any reasonable expectation of privacy in his IP address.

Trial commenced on the child pornography charges on November 12, 2008. During the government's case-in-chief, Agent MacFarlane testified about the FBI's contact with Lochmiller and the efforts to obtain from him the IP addresses of people using NAMGLA's website. MacFarlane acknowledged that Buehler served as an intermediary between the FBI and Lochmiller and, on cross-examination, MacFarlane

---

[1]As discussed further below, Christie's allegations of outrageous conduct are based on his assertion that the government violated its own guidelines for how government officials should interact with confidential informants. Essentially, Christie contends that the government's failure to follow those guidelines in its dealings with Lochmiller compromised the integrity of the entire investigation.

admitted that he had never met Lochmiller personally. Defense counsel further questioned MacFarlane about whether Lochmiller qualified as a confidential informant ("CI") under the Attorney General's Guidelines Regarding the Use of Confidential Informants (the "CI Guidelines"). Those guidelines define a "confidential informant" as "any individual who provides useful and credible information ... regarding felonious criminal activities, and from whom [the FBI] expects or intends to obtain additional useful and credible information regarding such activities in the future." ATT'Y GEN. GUIDELINES REGARDING THE USE OF CONFIDENTIAL INFORMANTS [hereinafter "CI GUIDELINES"] § I.B.6, *available at* http://www.fas.org/irp/agency/doj/fbi/dojguidelines.pdf. The guidelines establish rules applicable to all Department of Justice law enforcement agencies, *see id.* § I.A.3, and generally prohibit the use of fugitives and probationers as CIs. *Id.* § II.D.5-6. They also require that a law enforcement agent personally meet with and supervise an individual who will act as a CI. *Id.* § III.C.4-5.

MacFarlane testified that he did not consider Lochmiller to be a CI because, once Lochmiller provided access to the NAMGLA site, the FBI did not anticipate using him to obtain future information about illegal activities. Nonetheless, defense counsel obtained an admission from MacFarlane on cross-examination that the CI Guidelines are designed, in part, to prevent the implication of innocent individuals in criminal activity. Defense counsel later argued in closing that Lochmiller qualified as a CI. Thus, counsel insinuated that MacFarlane had deviated from the CI Guidelines in relying on information

7

supplied by Lochmiller and that MacFarlane's conduct created the risk that Lochmiller had falsely implicated Christie and other users of the NAMGLA website. The alleged unreliability of the investigation was central to Christie's defense at trial.

On redirect examination, the government sought to rebut the suggestion of unreliability by asking MacFarlane to "relay ... the circumstances and facts gathered at the takedown of this investigation that would address the concerns ... raised in terms of the implication of innocent people[.]" (App. at 380.) Christie objected that MacFarlane lacked sufficient personal knowledge to answer the question, but the Court overruled the objection after the government pointed out that MacFarlane was the lead agent on the case. MacFarlane then responded that, "[o]n the day of the takedown nationwide, the F.B.I. executed approximately 30 search warrants on houses all across the country. Of those 30, it's my understanding that the F.B.I. obtained partial or full confessions from 24 separate individuals on child pornography-related offenses."[2] (*Id.* at 381.)

Also during Agent MacFarlane's testimony, the Court questioned why users of the NAMGLA website did not pay a fee to access the website's content, which prompted the following exchange:

| | |
|---|---|
| THE COURT: | Let me ask you this. A person wants to be a user, wants to get this information. Does he pay for it? |
| THE WITNESS: | Not on this site, no. |
| THE COURT: | Then it was just sexual gratification in seeing these pictures? |

---

[2]Christie did not move to strike MacFarlane's response from the record.

THE WITNESS:    I would surmise that for the people who would post this, yes.

THE COURT:      If you know, is there any monetary return to these people who engage in this sort of activity, or are they just getting their kicks, as the word is used colloquially?

(*Id.* at 235.)  At that point, the defense raised an objection to the line of questioning, which the Court overruled.  MacFarlane then continued:

THE WITNESS:    On this website, I did not see anything to indicate that it had a financial motive or there was any way you could pay for this.  It was more of an exchange, meaning – you give something to get something.  That was not monetary, it was pictures.

THE COURT:      So what you're saying, it's your opinion it's the gratification of seeing the pictures.

THE WITNESS: That would be my understanding of what these people would be motivated by, yes.

(*Id.* at 235-36.)

Later in the trial, Bennett testified regarding the two posts that Christie admitted uploading under the screen name "franklee." Specifically, Bennett testified that Christie acknowledged having submitted the posts and that Christie described them as "fantasies." (*Id*. at 608.) Although Bennett told the jury that one post concerned a nine year old in a supermarket and the other concerned becoming aroused while changing a baby's diaper, the government elicited no further information regarding the content of those posts. Bennett also testified that agents had discovered toys in Christie's apartment, and that Christie had explained that he used them to quiet rowdy children on his school bus.

Christie objected to the testimony regarding the subjects of the posts as irrelevant and unduly prejudicial, and he objected to testimony concerning the toys as unduly prejudicial. The Court overruled those objections. It reasoned that the posts showed that Christie visited the NAMGLA site with the intent of exchanging child pornography. The Court permitted testimony about the toys after the government argued that it linked Christie to his occupation as a bus driver and therefore showed that he responded truthfully during the interrogation by Bennett.

Trial lasted for eight days, after which the jury convicted Christie on all eight counts of the indictment. Christie filed a post-trial motion in which he argued that the jury's verdict should be vacated and the charges against him dismissed because of the

government's allegedly outrageous conduct, namely, its lack of control over Lochmiller and its permitting Lochmiller to continue running the NAMGLA website, all in violation of the CI Guidelines. The Court denied that motion, concluding that, even if the CI Guidelines applied to Lochmiller, "the FBI's failure to follow [them,] without more, does not constitute outrageous conduct worthy of setting aside a conviction." (App. at 79.)

C. *Sentencing*

Christie was sentenced on June 23, 2009. Under § 2G2.2 of the Sentencing Guidelines, the District Court calculated that, after several applicable enhancements, Christie's total offense level was 45 and his criminal history category was I, producing a Guideline range sentence of life imprisonment. The District Court, recognizing that the recommended sentence was life imprisonment, stated that it would impose "a life sentence consisting of the statutory minimum sentence applied consecutively on Counts 1 through 6." (App. at 2007.) The Court then sentenced Christie to 1,080 months imprisonment, which represented the mandatory minimum sentence of fifteen years on each of Counts 1 through 6, 18 U.S.C. § 2251(e), to be served consecutively; the mandatory minimum of five years on Count 7, *id.* § 2252A(b)(1) to be served concurrently; and a five-year sentence on Count 8, *id.* § 2252A(b)(2), to be served concurrently. In support of that sentence, the Court stated that Christie was more than "a mere downloader of child pornography," (App. at 1996), that, instead, he had a collection of child pornography containing thousands of images and was a moderator of the

11

NAMGLA website and a remorseless promoter of materials depicting minors engaged in sexual conduct.

## II. Discussion[3]

On appeal, Christie advances four types of objection to the proceedings in the District Court. First, he argues that the District Court erred in admitting certain evidence at his trial. Second, he argues that the manner in which the government obtained evidence from Lochmiller violated due process. Third, he argues that the government violated his Fourth Amendment right against unreasonable searches and seizures when it obtained his IP address without a warrant. And fourth, he argues that his sentence is unreasonable. We address each of those challenges in turn.

### A. *Evidentiary Rulings at Trial*

Christie challenges the District Court's permitting MacFarlane to testify that the FBI apprehended other users of the NAMGLA website on the same day he was arrested and that twenty-four of those users confessed to child pornography-related offenses. He also appeals the District Court's decision to admit evidence concerning the two posts that he acknowledged submitting to the NAMGLA website, the Court's allowing testimony about the toys seized from his apartment, and the Court's admitting into evidence his five composition notebooks. Further, he argues that the District Court improperly sensationalized the trial when it asked MacFarlane whether people who visited the

---

[3]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

12

NAMGLA website did so to "get[] their kicks" and for "sexual gratification." (App. at 235.) Finally, he contends that, the cumulative effect of all of these errors was unfair jury prejudice against him.

We review for abuse of discretion both the admissibility of evidence and the District Court's questioning of a witness. *See United States v. Starnes*, 583 F.3d 196, 213-14 (3d Cir. 2009) ("We review a trial court's decision to admit or exclude evidence for abuse of discretion."); *United States v. Adedoyin*, 369 F.3d 337, 342 (3d Cir. 2004) (reviewing questioning of a witness by a district court for abuse of discretion). Even if we find an abuse of discretion, the Court's ruling will stand if the error was harmless. *See United States v. Casoni*, 950 F.2d 893, 902 (3d Cir. 1991). We review for plain error any objections that were not specifically raised before the District Court. *See United States v. Iglesias*, 535 F.3d 150, 158 (3d Cir. 2008). Under that standard, a defendant must establish that there was an error that was plain or obvious, that it affected his substantial rights, and that, if not rectified, it would seriously affect "the fairness, integrity or public reputation of judicial proceedings." *United States v. Lessner*, 498 F.3d 185, 192 (3d Cir. 2007) (quotations omitted).

1.     *MacFarlane's Statement that Other Users of the NAMGLA Site Confessed to Child Pornography Offenses*

Christie objects on the following grounds to MacFarlane's statement regarding the confessions of other NAMGLA site users: (1) MacFarlane lacked personal knowledge about each of the interrogations; (2) MacFarlane's testimony was hearsay; (3) admission

13

of the testimony violated the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004); (4) the testimony was irrelevant; (5) even if it was relevant, it was unduly prejudicial; and (6) the testimony constitutes improper vouching. Of these objections, the only one that Christie raised at trial was that MacFarlane lacked personal knowledge. We thus review the District Court's ruling on that issue for abuse of discretion, and we review Christie's arguments on the remaining five issues for plain error. None provide a basis for reversal.

Christie asserts that MacFarlane never testified that he was actually involved in all 30 arrests and interrogations, and that his testimony should therefore have been excluded under Federal Rule of Evidence 602 because he lacked personal knowledge from which to testify about the disposition of those cases. The argument rests on the unsound premise that the only competent testimony about a complicated transaction is testimony from eyewitnesses at every step. "Although first-hand observation is obviously the most common form of personal knowledge, that is not the only basis for it." 3 JACK B. WEINSTEIN & MARGARET A. BERGER WEINSTEIN'S FEDERAL EVIDENCE § 602.03[1][a] (2d ed. 2010); *cf. United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994) (bank employee could testify as to bank's federally insured status because, even though she was not employed until after bank robbery at issue, her job exposed her to records indicating that the bank was federally insured). We reject Christie's challenge because MacFarlane's responsibilities gave him sufficient information to testify about various aspects of the investigation, including its immediate aftermath. As the lead FBI agent,

MacFarlane oversaw the investigation of all of the users of the NAMGLA website, was thoroughly familiar with the case, coordinated the efforts of other agents, and personally directed the enforcement steps on "takedown day," even if he did not conduct each step himself. The extent of that supervisory involvement provided an appropriate level of personal knowledge for MacFarlane to testify about the outcome of the investigation. *See United States v. Sutton*, 795 F.2d 1040, 1057 (Temp. Emer. Ct. App. 1986) (testimony of government witness who supervised audit was based on personal knowledge). Accordingly, the District Court properly rejected Christie's assertion that MacFarlane was not competent to testify about the responses of other targets of the investigation.

Christie next argues that MacFarlane's testimony about the other targets' acknowledgment of guilt constitutes inadmissible hearsay and that the testimony was irrelevant because it was not probative of Christie's guilt. According to Christie, even though he raised no objection along these lines at trial, the District Court should have precluded the testimony *sua sponte*. We disagree.

The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See* FED. R. EVID. 801(c). MacFarlane testified about the confessions only after Christie had insinuated that Lochmiller was an unreliable source of information who may have implicated innocent people in the NAMGLA investigation, and that the FBI's investigation was likewise unreliable because it depended on information obtained from Lochmiller. The District Court could properly

have viewed MacFarlane's response as being elicited to explain why he viewed Lochmiller as a credible source. From that perspective, MacFarlane's testimony is not hearsay because it was offered for the purpose of rebutting Christie's charge of misguided law enforcement efforts and not offered for the truth of whatever the other investigative targets may have said. Christie himself acknowledges that the evidence had a rebuttal purpose, as he recognizes in his brief that the government's use of MacFarlane's testimony was meant to "establish the reliability of the investigation." (Appellant's Op. Br. at 14.)

That distinction between a permissible and an impermissible purpose for the evidence is no mere technicality. Having put both MacFarlane's and Lochmiller's credibility at issue, the defense invited MacFarlane to say why he viewed the investigation as resting on reliable information. *See United States v. Milan*, 304 F.3d 273, 290 & n.22 (3d Cir. 2002) (defendant opened the door to testimony concerning judicial approval of wiretaps obtained during investigation by suggesting that "the government was willing to engage in improprieties ... in order to convict [defendant]"). At that point, the question was whether there were indicia of reliability regarding what Lochmiller had told the FBI, and the existence of the confessions provided an answer. Their existence, not their details, or even ultimately their truth, was relevant to rebut the implication that the investigation was a dragnet for the innocent and that MacFarlane knew it. Thus, the testimony can be seen as relevant to a proper, non-hearsay purpose because it illustrated the reliability of the investigation, a fact of considerable consequence since challenging

16

the nature of the investigation was at the crux of Christie's defense.  *See United States v. Lugo Guerrero*, 524 F.3d 5, 14 (1st Cir. 2008) (finding evidence admissible to combat defense theory).

Christie also contends that MacFarlane's testimony violated his rights under the Confrontation Clause of the Constitution, *see Crawford v. Washington*, 541 U.S. 36 (2004), because he had no opportunity to cross-examine any of the individuals who confessed to child-pornography related offenses.  But, our conclusion that the testimony was properly introduced for a non-hearsay purpose is fatal to Christie's *Crawford* argument, since "the Confrontation Clause ... 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"  *See United States v. Hendricks*, 395 F.3d 173, 183 (3d Cir. 2005) (quoting *Crawford*, 541 U.S. at 59 n.9)).  We likewise reject Christie's assertion that the testimony was unfairly prejudicial, especially since it was elicited for the purpose of rebutting Christie's own challenge to the investigation.  *See United States v. Boone*, 279 F.3d 163, 188 (3d Cir. 2002) ("[G]iven [defendant's] ... defense, this evidence was proper under Rule 403.").  The District Court did not plainly err in allowing the testimony to come into evidence.

Finally, Christie argues that MacFarlane's testimony constitutes improper vouching or bolstering because he was essentially assuring the jury that the investigations of other users actually culminated in confessions, without introducing any evidence to that effect.  Vouching occurs when a prosecutor "(1) assures the jury that the testimony of a government witness is credible, and (2) ... bases his assurance on either his claimed

17

personal knowledge or other information not contained in the record." *United States v. Lore*, 430 F.3d 190, 211 (3d Cir. 2005). Here, the description of the investigation as it implicated other users came from MacFarlane's testimony, which was based upon his knowledge as the lead agent on the case. Thus, as already noted, MacFarlane's knowledge provided a proper basis for his testimony, and his testimony is itself the evidence of record. There is no sensible vouching or bolstering challenge to be made. *See United States v. Milan*, 304 F.3d 273, 290 (3d Cir. 2002) (rejecting vouching challenge since prosecutor "never made any statement that invited a plausible jury inference of extra-record proof of reliability ... .").

In sum, the District Court did not abuse its discretion or otherwise commit error, let alone plain error, in admitting MacFarlane's testimony concerning the confessions of other users of the website.

2.      *Admissibility of Two Posts to the NAMGLA Website and the Children's Toys*

Christie next contends that the District Court should have excluded as irrelevant and unfairly prejudicial the subject matter of the two posts that Christie admitted putting on the NAMGLA website (i.e., the post concerning a nine-year-old in a grocery store and the post concerning arousal while changing a baby's diaper) and likewise should have excluded the evidence of the children's toys in his house. Although Christie objected at trial to introduction of the subject matter of the NAMGLA posts as irrelevant and unfairly prejudicial, he objected to the statement concerning the toys only as unfairly prejudicial.

18

Accordingly, we review his challenge to the relevance of the testimony about the toys for plain error.

The NAMGLA posts were certainly relevant to the charged child-pornography offenses. The posts were submitted under Christie's screen name of "franklee" and indicated that Christie visited the NAMGLA site with the purpose of exchanging child pornography. Despite that obvious relevance, Christie contends that the posts were unduly prejudicial because they painted him as a sexual predator "actively engaged in looking for children[.]" (Appellant's Op. Br. at 35.) That Christie's own posts may bear that interpretation does not make them irrelevant or unfairly prejudicial. The potential impact of information about the NAMGLA posts was no doubt prejudicial, but the District Court was well within the bounds of its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Furthermore, the government did not introduce the posts themselves, instead eliciting only testimony concerning the subjects of the posts. There was no abuse of discretion in the District Court's decision to admit that testimony. *See Starnes*, 583 F.3d at 215 ("[U]nfair prejudice does not simply mean damage to the opponent's cause. If it did, most relevant evidence would be deemed [unfairly] prejudicial.... [T]he fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403." (quotations omitted and alterations in original)).

As to the toys, Christie asserts that "[n]othing about the fact that he had children's toys in his house made it more likely that he possessed, received or advertised images of

child pornography than it would have been without the evidence," and that the evidence was "extremely prejudicial" because it created the impression that he was a "sexual predator" even though he was not charged with sexual abuse of a minor. (Appellant's Op. Br. at 34-35.) The government responds that testimony concerning the toys was relevant because it corroborated Christie's confession to Bennett. The government's reasoning is that, since Christie was truthful about his profession as a bus driver, and mentioned being a bus driver while explaining the toys, he must have been telling the truth when he admitted to posting his "fantasies" to the NAMGLA website. Further, the government asserts that the testimony was not unduly prejudicial since the government never actually argued that Christie was a pedophile.

Here we are in agreement with Christie, and the government's painfully strained reasoning serves as its own refutation. On this record, there does not appear to be any legitimate basis for claiming that the toys were relevant. While the truthfulness of Christie's acknowledgment that he was a bus driver may have some tendency, albeit weak, to suggest that he was truthful in his entire discussion with Bennett, that point could have been made without any mention of the toys at all. Bus driving, not toy possession, is the supposed tie to truthfulness. However, even if one assumes the toys had some relevance, the danger of unfair prejudice clearly and substantially outweighed it. The implication of the testimony is just what Christie contends: that, as a bus driver with access to children, he used the toys in attempt to make contact with children and, given his aberrant interests, to molest them. But, as Christie notes, he was charged with

20

possession of child pornography, not child molestation. Accordingly, the evidence concerning the toys was substantially more likely to have an unfair prejudicial effect than to benefit the jury in determining Christie's guilt on the crimes charged. The District Court therefore erred in admitting Bennett's testimony on that issue.

As unduly prejudicial as that evidence may have been in this context, we nevertheless conclude that the error was harmless given the truly overwhelming quantity of legitimate evidence against Christie, including his admissions to Bennett, his moderator status and activities on the NAMGLA site, his handwritten notebooks documenting and rating various child-pornography related websites, and the thousands and thousands of images of child pornography in his possession. *See United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999) (explaining that an error is harmless when the court is convinced that the defendant was not prejudiced by it, and noting that "[t]he factors to be examined [in making that determination include] ... the scope of the comments and their relationship to the proceeding, ... and the strength of the evidence against [the] defendant[]."); *see also United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001) (noting the similarity of harmless error standard and inquiry, under plain error standard, as to whether an error affected a defendant's substantial rights). Christie himself acknowledges that "[t]he government had ... an extraordinary amount of relevant, admissible, and indisputably disturbing evidence, which it displayed and described multiple times." (Appellant's Op. Br. at 44.) The testimony concerning the toys was brief, spanning only fifteen lines in the transcript of an eight day trial, and the toys were

not mentioned in the government's closing.  Accordingly, it is "'highly probable that the error did not contribute to the judgment.'"  *See United States v. Vosburgh*, 602 F.3d 512, 540 (3d Cir. 2010) (quoting *Dispoz-O-Plastics, Inc.*, 172 F.3d at 286); *see also United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) (holding that evidentiary error was harmless when government did not rely on testimony in summation and when evidence against  defendant was "overwhelming").

### 3. *Admissibility of the Composition Notebooks*

Christie next says it was error for the District Court to admit into evidence the five composition notebooks seized from his home.  He acknowledges that "excerpts from the notebooks" would have been admissible, but contends that admission of the notebooks in their entirety was unfairly prejudicial under Federal Rule of Evidence 403.  (Appellant's Br. at 40.)  Specifically, he contends that the notebooks were unnecessary in light of the other evidence that he possessed and advertised child pornography, and that the notebooks created a risk that the jury would convict solely based on them instead of considering whether any illegal images of child pornography could actually be linked to him.

The notebooks were part and parcel of Christie's trade in child pornography and directly link him to the screen name "franklee."  They show the lengths to which he went to make such material accessible, and they provide significant proof that he was not a mere possessor but acted as a facilitator and conduit for others to obtain child pornography.  The probative value of the notebooks therefore clearly outweighed any

22

danger of unfair prejudice, and the District Court did not abuse its discretion in refusing to exclude the notebooks under Rule 403.

4.    *The District Court's Questioning*

Christie next attacks the District Court for the nature of its questions to MacFarlane regarding the likely motive of users of the NAMGLA website. Federal Rule of Evidence 614 gives the District Court the authority to question witnesses on its own. The District Court did not abuse its discretion in asking MacFarlane to describe, from his law enforcement experience, why sites like NAMGLA do not require payment and why individuals visit them. The Court's questioning went to appropriate issues such as how NAMGLA functioned and what motive Christie had to provide a forum for swapping child pornography. Furthermore, the Court instructed the jury not to attribute any opinions to the Court in connection with its questions. Although the Court's framing of its questions in colloquial terms, such as asking whether users visit such sites for "kicks," was less than ideal, there was no abuse of discretion in the questioning.

5.    *Cumulative Effect of the Alleged Evidentiary Errors*

Christie asserts that, even if the alleged errors do not constitute reversible error on their own, when taken together, they created a prejudicial effect that overwhelmed any possibility of a fair consideration of the evidence against him. However, we have noted only one error in the numerous evidentiary rulings that Christie challenges – the District Court's admission of the testimony concerning the toys seized from Christie's home – and we have already concluded that that error was harmless, in light of the overwhelming

23

evidence of guilt in this case. We thus readily conclude that, taken together, the purported errors do not entitle Christie to a new trial.

B. *The Handling of Lochmiller Under the CI Guidelines*

Christie next argues, as he did to the District Court, that, by failing to abide by the CI Guidelines, "[t]he government's investigation and prosecution of [the case against him] constituted outrageous government conduct" that violated his due process rights. (Appellant's Op. Br. at 45.) He claims there were several violations of the Guidelines, including (1) that MacFarlane knew that Lochmiller was on probation but did not contact probation authorities; (2) that the paperwork required to register a confidential informant had not been completed; and (3) that, although confidential informants are not supposed to engage in criminal activity without authorization and supervision, Lochmiller continued to run the NAMGLA website. *See* CI GUIDELINES §§ II.A-B, II.D.5, III.C. According to Christie, the government's failure to follow the CI Guidelines meant that MacFarlane and other agents lacked control over Lochmiller, which Christie alleges violated his right to due process because, absent such control, the government "simply cannot vouch for the integrity of the data on [the NAMGLA] site," and thus innocent people are exposed to prosecution. (Appellant's Op. Br. at 54.)

In assessing Christie's claim of outrageous government conduct, we review the District Court's factual findings for clear error and exercise plenary review over the Court's legal conclusions. *United States v. Lakhani*, 480 F.3d 171, 181 (3d Cir. 2007). "[W]e repeatedly have noted that we are 'extremely hesitant to find law enforcement

24

conduct so offensive that it violates the Due Process Clause.'" *United States v.*

*Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008) (quoting *United States v. Voigt*, 89 F.3d

1050, 1065 (3d Cir. 1996)).

The CI Guidelines do not themselves create rights for criminal defendants. *See*

*United States v. Henry*, 482 F.3d 27, 33 (1st Cir. 2007) ("Justice Department guidelines

were not compelled by statute, nor intended to create private rights."); *cf. United States v.*

*Caceres*, 440 U.S. 741, 751-52 (1979) (reversing suppression of evidence obtained in

violation of IRS regulations). Accordingly, even if those Guidelines were violated, that

would not mean, in itself, that Christie would be entitled to relief. The pertinent question

is whether the government's conduct was so outrageous or shocking that it amounted to a

due process violation. *See Hoffecker*, 530 F.3d at 153-54; *United States v. Nolan-Cooper*,

155 F.3d 221, 229 (3d Cir. 1998) ("[A] criminal defendant may raise a due process

challenge to an indictment against her based on a claim that the government employed

outrageous law enforcement investigative techniques."). The CI Guidelines are relevant,

if at all, only to the extent that they indicate boundaries the FBI views as defining good

law enforcement practices in working with CIs. They do not purport to be rules, much

less a statement of the limits of constitutional behavior.

Assuming that the CI Guidelines apply to the government's interactions with

Lochmiller, which is a point in dispute, the alleged failures to abide by the Guidelines did

not violate Christie's due process rights. Cases in which we have found due process

violations have involved far more egregious government conduct. For example, we have

determined that due process was violated when the government itself manufactured the illegal activity and then prosecuted others who engaged in that activity alongside government actors. *See United States v. Twigg*, 588 F.2d 373, 379 (3d Cir. 1978) ("We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators."). Here, in contrast, the government gained access to ongoing illegal activity through an intermediary, Lochmiller. The government benefitted from the information and site access that Lochmiller provided, but it did nothing to create or encourage criminal acts, and there is no evidence that the information Lochmiller gave was untrustworthy.

C.     *Unreasonable Search and Seizure*

Christie contends that the District Court erred in denying his motion to suppress because, as he sees it, the government's acquisition of his IP address, in connection with the administrative access given by Lochmiller, violated his Fourth Amendment rights. "We review the denial of a motion to suppress for clear error as to the underlying factual determinations and exercise plenary review over the application of the law to those facts." *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006).

Christie's argument hinges on the flawed premise that he possessed a reasonable expectation of privacy in his IP address. Federal courts have uniformly held that "subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation" because it is voluntarily conveyed to third parties.

26

*United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008); *see also United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010) (holding that a defendant could not point to any "evidence that he had a subjective expectation of privacy in his internet ... subscriber information" because he "voluntarily conveyed" that information to the company, and "assumed the risk" that the company would provide that information to the police (internal citations omitted)); *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001) ("We conclude that plaintiffs ... lack a Fourth Amendment privacy interest in their subscriber information because they communicated it to the systems operators."). Similarly, no reasonable expectation of privacy exists in an IP address, because that information is also conveyed to and, indeed, from third parties, including ISPs. "IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers." *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008); *cf. Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) (pointing out that the Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties"). Christie therefore had no reasonable expectation of privacy in his IP address and so cannot establish a Fourth Amendment violation.[4] The District Court properly denied his motion to suppress.

---

[4]The one case upon which Christie relies, *State v. Reid*, dealt specifically with the New Jersey constitution, not the federal constitution, and is thus inapposite here. 945 A.2d 26, 28 (N.J. 2008) ("We now hold that citizens have a reasonable expectation of privacy, protected by Article I, Paragraph 7, of the New Jersey Constitution, in the subscriber information they provide to Internet service providers ... ."). Indeed, the court specifically recognized the absence of a right to privacy in subscriber information under

D.    *Sentencing*

Finally, Christie argues that his sentence is unreasonable.  He does not object to the enhancements imposed in his case.  Instead, he says that § 2G2.2 is inherently flawed because the enhancements apply in even the most routine cases, thereby producing unnecessarily severe results, and that his sentence is thus *per se* unreasonable because it was based upon a sentencing range dictated by that Guideline.  We review a district court's sentencing order for reasonableness, under an abuse of discretion standard.[5] *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009).

Whether or not § 2G2.2 may produce unreasonable sentences in some cases – a subject on which we make no comment here – the sentence in this case is not unreasonable.  First, Christie's collection of many thousands of images of child pornography powerfully indicates that his is not the routine case.  Second, and more importantly, Christie helped to run a network that allowed for the trading of hundreds of thousands of unlawful images.  As a moderator of the NAMGLA site, he facilitated the trading and possession of child pornography by other users, showing that he is guilty of far more than mere possession.  Third, the District Court noted that Christie expressed no

---

the federal constitution, but reached a contrary result under the New Jersey Constitution because "the search and seizure protections in the federal and New Jersey Constitutions are not always coterminous."  *See id*. at 31-32 (quotations omitted).

[5]Although Christie purports to be arguing that his sentence is both procedurally and substantively unreasonable, his sole argument – that his sentence is unreasonable because it was based on a Guideline that allegedly produces overly severe sentences – is a challenge only to substantive reasonableness.

remorse and believed that he was likely to reoffend in the future.  All of those facts support the reasonableness of the District Court's sentence, based on Christie's particular history and characteristics and the specific characteristics of his offense.  Accordingly, on the facts of this case, we are satisfied that the sentence was within the bounds of reasonableness.

III.    Conclusion

For the foregoing reasons, we will affirm the judgment of conviction and sentence imposed by the District Court.