NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2202
_____

UNITED STATES OF AMERICA

v.

DENNIS ELWELL,
                              Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cr-00864-001)
District Judge:  Hon. Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
March 5, 2013

Before:   SCIRICA, JORDAN, and ROTH, *Circuit Judges*.

(Filed: March 13, 2013)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Dennis Elwell appeals a final judgment of conviction and sentence entered on

April 12, 2012, sentencing him to 30 months' imprisonment and one year of supervised

release for acceptance of a corrupt payment, in violation of 18 U.S.C. §§ 666(a)(1)(B), 2.

For the following reasons, we will affirm.

## I. Background[1]

Elwell served as mayor of Secaucus, New Jersey from 2000 until 2009, when he was arrested in connection with a large-scale corruption investigation involving numerous New Jersey public officials and political candidates. His troubles began on April 23, 2009, the day he was introduced to Solomon Dwek, a government informant posing as real estate developer "David Esenbach."[2] At that meeting, Dwek explained that he was interested in contributing to Elwell's reelection campaign, and that he would like some of his development projects in Secaucus "expedite[d]." (Appellee's Br. at 3.) Dwek reiterated those interests four days later during a meeting with Ronald Manzo, a longtime friend of Elwell's. Specifically, he promised payments of $10,000 before and after the upcoming election, while seeking assurances that Elwell would "expedite [his] stuff." (App. at 863.)

Following those initial encounters, Manzo arranged for a meeting on May 28, 2009, which was attended by Elwell, Manzo, Dwek, and Edward Cheatam, another political operative. At that meeting, Dwek was explicit about the terms of his offer. In exchange for Elwell "smooth[ing] out the speed bumps" (App. at 889), in Dwek's proposed development of a 400-room hotel, he would give Elwell $10,000 then and there, would "do another ten after the primary," and would provide "[a]nything" Elwell needed

---

[1] "[W]hen reviewing convictions, we recite the relevant facts in the light most favorable to the [g]overnment." *United States v. Stadtmauer*, 620 F.3d 238, 242 n.1 (3d Cir. 2010) (second alteration in original).

[2] Dwek was arrested on May 11, 2006, by the FBI for, among other things, money laundering and bank fraud. He entered into a plea agreement in which he agreed to become a government informant in return for a substantially lower sentence.

after the election (App. at 896). Elwell nodded his head in agreement throughout the conversation,[3] and when Dwek sought assurance that his "road" would be "paved," Elwell responded "[a]bsolutely, absolutely." (App. at 907.) He also explicitly agreed not to associate Dwek's name with the money. Manzo then accompanied Dwek to his car and received a FedEx envelope containing $10,000 in cash, which Dwek directed him to give to Elwell. Manzo did as directed, and Elwell accepted the money.

Following Elwell's acceptance of the cash, Dwek attended at least two more meetings during which it was discussed. The first occurred at a crowded restaurant on June 2, 2009, and was attended by Manzo, Dwek, and Cheatam. During that meeting, Dwek asked Manzo whether he gave Elwell the money without incident. Manzo, who testified at trial that he had been "paranoid" about being overheard, wrote on a napkin "[y]es, no problem." (App. at 250-51, 857.) Two weeks later, the three met with Elwell to discuss potential sites for Dwek's proposed hotel. During that discussion, Elwell confirmed that he had received the $10,000, and Dwek thanked him for his support.[4] At no point did Elwell return the money to Manzo or Dwek, nor did he report it as a campaign contribution.

Less than a week after that meeting, Elwell, Manzo, and Cheatam were arrested, and on November 17, 2009, a grand jury indicted Elwell and Manzo for conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951(a) (Count

---

[3] Dwek videotaped all of his meetings, and those tapes were admitted into evidence at trial.

[4] Elwell contends that he called Manzo later that day to inform him that he wished to return the money, but Manzo denied at trial that they spoke about it.

1), for attempted extortion under color of official right, in violation of 18 U.S.C. §§ 1951(a), 2 (Count 2), and for acceptance of a corrupt payment, in violation of 18 U.S.C. §§ 666(a)(1)(B), 2 (Count 3).[5] Manzo pled guilty to Count 1,[6] and a superseding indictment was returned charging Elwell with the three original offenses. He went to trial on those charges on June 20, 2011. Shortly before his trial began, Elwell called his former secretary, Madelon Michaels, in violation of a condition of his bail order that he have "no contact with witnesses … in this case." (App. at 621-22.)

At trial, Elwell testified in his own defense, and admitted that he accepted the $10,000 from Dwek. He maintained that he thought the payment was a campaign contribution, and that he made clear to Dwek that he did not have zoning authority over the particular area in which Dwek wished to build his hotel. In response, the government presented evidence of Elwell's experience in politics, his knowledge of campaign contribution laws, and his powers and authority over Secaucus development projects, arguing that "[h]e understood exactly what [Dwek] was proposing," (App. at 702) and "corruptly accepted [the] payment in exchange for his assistance … as Mayor." (App. at 703.)

On July 6, 2011, the jury found Elwell guilty on Count 3 and not guilty on Counts 1 and 2. Elwell then filed a motion for a new trial or judgment of acquittal, arguing that

---

[5] Cheatam and Denis Jaslow, another of Elwell's political operatives, pled guilty to separate charges and did not testify at Elwell's trial.

[6] As part of the plea bargain, Manzo agreed to truthfully answer questions presented by the government and testify in Elwell's trial. In return, the government agreed to drop two of his charges on a separate indictment.

4

there was insufficient evidence to support his conviction, and, in the alternative, that a new trial was necessary because the government had improperly attempted to link him to other corrupt Hudson County politicians, had wrongfully used character evidence against him, and had impermissibly attacked defense counsel. The District Court denied that motion and subsequently sentenced Elwell to 30 months' imprisonment followed by a one-year term of supervised release. He was also fined $10,000, and ordered to forfeit the $10,000 payment. This timely appeal followed.

## II.    Discussion[7]

On appeal, Elwell argues that numerous errors at trial render the jury's verdict unreliable, and thus entitle him to a new trial. Specifically, he argues that the District Court allowed the introduction of irrelevant and unfairly prejudicial evidence, and that it erroneously refused to grant him a new trial due to several instances of prosecutorial misconduct. We address those arguments in turn.

---

[7] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

A.    *Evidentiary Challenges*[8]

Elwell challenges the introduction of a number of different pieces of evidence,

which fall into three general categories:  (1) references to other corrupt Hudson County

public figures; (2) evidence of his violation of his bail order; and (3) testimony regarding

his authority and influence over the Hackensack Meadowlands Commission (the

"Commission").[9]  He maintains that all of that evidence is irrelevant or unfairly

prejudicial, and that the evidence regarding his bail violation is further barred because it

is impermissible character evidence.

 "Relevant evidence means evidence having any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." *United States v. Starnes*, 583 F.3d 196,

214 (3d Cir. 2009) (quoting Fed. R. Evid. 401) (internal quotation marks omitted).

Because "Rule 401 does not raise a high standard," evidence is considered irrelevant only

if it "has no tendency to prove a consequential fact." *Id.* (internal quotation marks

---

[8] "We review a trial court's decision to admit or exclude evidence for abuse of discretion," and review "for plain error any objections that were not specifically raised before the District Court." *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010) (internal quotation marks omitted).  "[A]dmission of evidence is an abuse of discretion if the district court's action was arbitrary, fanciful or clearly unreasonable, and [w]e will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view." *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (internal quotation marks omitted).  Under plain error review, "a defendant must establish that there was an error that was plain or obvious, that it affected his substantial rights, and that, if not rectified, it would seriously affect the fairness, integrity or public reputation of judicial proceedings." *Christie*, 624 F.3d at 567 (internal quotation marks omitted.)

[9] The Commission is the state entity that Elwell contends had zoning authority over of the land that Dwek intended to develop.

omitted). A fact does not have to be an element of the offense to be "consequential." Rather, evidence that aids the jury in understanding the background and the nature of the underlying offense also has probative value. *See* Fed. R. Evid. 401 advisory committee's note; *United States v. Byers*, 603 F.3d 503, 506 (8th Cir. 2010) (recognizing that "[a] jury is entitled to know the circumstances and background of a criminal charge" and permitting "the introduction of evidence providing the context in which the crime occurred" (internal quotation marks omitted) (alteration in original)).

Although the general rule is that "[r]elevant evidence is admissible," Fed. R. Evid. 402, the Rules of Evidence provide for certain exclusions of otherwise relevant evidence. Under Rule 403, a district court may exclude evidence "if its probative value is substantially outweighed by the danger of … unfair prejudice, confusing the issues, [or] misleading the jury," Fed. R. Evid. 403. We afford the district court broad discretion in making that determination, and thus its decision to admit or exclude such evidence "cannot be reversed merely because we[] … possess a different view concerning the probative value or prejudicial effect of the challenged evidence." *United States v. Universal Rehab. Servs., Inc. (PA)*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc).

Rule 404 also guards against unfairly prejudicial evidence by limiting the use of character evidence. Under that Rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* Fed. R. Evid. 404(b)(1). Rule 608 provides for an exception to that bar, however, by permitting evidence of a witness's character for truthfulness or untruthfulness in certain circumstances. Fed. R. Evid. 608(b)

7

(permitting cross-examination regarding a witness's specific instances of conduct "if they are probative of the character for truthfulness or untruthfulness").  Evidence of wrongful acts is also admissible if it is used for a purpose other than showing propensity, such as proving motive, intent, or knowledge.  Fed. R. Evid. 404(b)(2).

With those principles in mind, we turn to the specific pieces of evidence at issue here.

### 1. References to Other Hudson County Politicians

Elwell argues that the District Court erred by allowing the government to elicit testimony from Manzo and Elwell regarding the criminal activities of other Hudson County politicians.  According to Elwell, such evidence served only to advance the government's theory that he was "just another corrupt Hudson County politician" (Appellant's Opening Br. at 34), and thus prove "guilt by association" (*id.* at 40).  We disagree, and conclude that each specific reference to other corrupt officials was relevant and not unduly prejudicial.

The first challenged reference occurred during the government's direct examination of Manzo regarding his June 2 meeting with Dwek.  At that meeting, Manzo had responded to a question about the $10,000 payment by writing on a napkin, which he testified was because he was "paranoid" about having a conversation of that nature in a crowded restaurant.  (App. at 251.)  Elwell objected to the government asking Manzo if, at the time of that meeting, he had been aware of "other public officials getting in trouble for taking cash payments."  (App. at 252.)  During a sidebar, the government explained that its purpose for asking that question was "to explore the basis for his paranoia."

8

(App. at 251.) The District Court permitted Manzo to respond to the question, and he identified three specific politicians, including Robert Janiszewski, a former Hudson County Executive who faced well-publicized corruption charges. The Court then instructed the jury as follows:

> Ladies and gentlemen, you need to understand that sometimes evidence is admitted for a particular purpose, and I don't want you to get confused as to why we are talking about other politicians that may have gotten into trouble. First of all, you cannot infer guilt of the defendant by virtue of the fact that other politicians have been in trouble. Each case is individual in nature. That is not the reason why that evidence is coming in. Mr. Manzo indicated that he had some kind of concern, or I think "paranoia" was the word used, about the way the conversations were taking place in a public place. So this information is being introduced for the basis of his concern about having these kind of conversations when he was aware that other people have gotten into trouble. Okay. So that is the only … purpose for which it could be considered.

(App. at 252.) After that instruction, Elwell again objected, insisting during a second sidebar that Manzo had never indicated that he was paranoid due to other politicians' legal troubles, and thus the evidence was not probative of the basis for his paranoia. The Court concluded that a reasonable fact finder could infer that Manzo's knowledge contributed to his paranoia, and allowed the government to ask him if that was the case. He answered in the affirmative, and then explained that he "just felt that this was going down the same road as where these other politicians had been." (App. at 253.)

Although Manzo may have been somewhat led to that eventual statement, that does not make the evidence itself irrelevant or unfairly prejudicial. Manzo's statement that he knew of multiple other Hudson County politicians who had gotten into legal

9

trouble for accepting cash payments certainly could help the jury understand his napkin scribbling in the restaurant. Furthermore, any risk of unfair prejudice was minimized by the Court's limiting instruction to the jury, and by the fact that no details of the other politicians' offenses were admitted into evidence. *See* Fed. R. Evid. 403 (permitting a district court to exclude relevant evidence only if the risk of unfair prejudice substantially outweighs its probative value); *Universal Rehab. Servs.*, 205 F.3d at 668 ("[P]rejudicial effect is typically cured through a curative instruction to the jury."). The Court therefore did not abuse its discretion by permitting the challenged testimony.

Elwell also challenges two references to Robert Janiszewski and "Hudson County" politics that occurred during his cross-examination. First, he argues that the government should not have been allowed to inquire about Secaucus Township Administrator David Drumeler's work history, which included serving as Janiszewski's chief of staff.[10] Elwell had previously testified that he asked Drumeler about his ability to accept Dwek's payment, to which Drumeler responded, "You know you can't take cash." (App. at 529.) Drumuler's experience working for an individual who got into trouble for taking cash payments provides valuable context for that statement, as does Elwell's knowledge of that experience. Both facts could be viewed as making it less likely that Elwell genuinely thought the payment was a campaign contribution, and thus the evidence is relevant. The small chance that the jury might have inferred Elwell's guilt by association due to the

---

[10] Elwell did not object to the introduction of that evidence at trial, and thus, as discussed above, *see supra* note 8, we review its admission for plain error. *Christie*, 624 F.3d at 567.

10

mere mention of Janiszewski's name and a reference to his legal problems does not "substantially outstrip[] the probative value of this evidence," and it was thus properly admitted. *United States v. Kemp*, 500 F.3d 257, 295 (3d Cir. 2007) (rejecting the "novel position" that the mere mention of Al Sharpton's name posed a substantial risk of unfair prejudice).

Next, Elwell contends that the Court improperly permitted the government to ask him to confirm that he once commented to Janiszewski that "Hudson County government is ruled by the mayors." (App. at 615.) That evidence was intended to rebut Elwell's claim during his direct examination that he was a "weak mayor," and to demonstrate that he did have power over property development in Secaucus. (App. at 37.) It thus undermines Elwell's argument that he did not have the authority to do as Dwek requested, and is clearly relevant.[11] Furthermore, as discussed above, the mere mention of Janiszewski did not establish a connection between his conduct and Elwell's, and so did not pose a substantial risk that the jury would infer "guilt by association." *See Kemp*, 500 F.3d at 295.

In sum, all of the contested references to other Hudson County politicians were relevant and not unfairly prejudicial, and thus were properly admitted into evidence.

### 2.    *Elwell's Violation of his Bail Order*

Elwell also argues that the government should not have been permitted to cross-examine him regarding a violation of his bail order. That violation occurred when Elwell

___

[11]   To the extent that Elwell argues that no evidence regarding his actual authority over development projects is relevant, that argument fails for the reasons described *infra* in Section II.A.3.

11

called his secretary, Madelon Michaels, about being "a star witness" at trial. (App. at 622.) He made that call despite his having signed a bail order that included the condition that he have "no contact with witnesses … in this case." (App. at 621.) According to Elwell, the government's questions regarding the call were aimed at eliciting impermissible character evidence.

As discussed above, Rule 404 bars evidence of prior acts to demonstrate a person's propensity for those actions, but such evidence can be admissible when used for a non-propensity purpose. Fed. R. Evid. 404(b)(2). Here, the district court permitted the evidence of Elwell's telephone call on the basis that it could be viewed as an attempt to avoid punishment by tampering with or intimidating a witness. Such witness tampering could in turn support an inference that Elwell was conscious of his guilt. The evidence thus served a non-propensity purpose. *See United States v. Gatto*, 995 F.2d 449, 454 (3d Cir. 1993) ("It is well-established that evidence of threats or intimidation [of a witness] is admissible under Rule 404(b) to show a defendant's consciousness of guilt … ."). Given that "the district court is in the best situation to assess" whether "a statement actually constitutes an attempt to intimidate," *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006), we cannot say that the Court's conclusion here was an abuse of discretion. Moreover, the Court provided a jury instruction explaining the limited purpose for the introduction of the evidence, minimizing any risk of unfair prejudice. *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988) (requiring such an instruction for evidence of other acts introduced under Rule 404(b)).

12

The statements regarding the provisions of Elwell's bail order are similarly admissible. As the District Court rightly observed, the fact that the call to Michaels was an explicit violation of Elwell's bail order contributes to the inference that he was conscious of his guilt, and thus it serves the same non-propensity purpose as the call itself. Furthermore, as the Court noted, Elwell's willingness to disregard a signed statement arguably demonstrates his character for untruthfulness, which provides a basis for admissibility under Rule 608. Fed. R. Evid. 608(b) (allowing cross-examination regarding specific instances of a witness's conduct "if they are probative of the character for truthfulness or untruthfulness"). The Court therefore did not abuse its discretion by admitting the evidence related to Elwell's bail violation.

### 3. Influence Over the Meadowlands Commission

Finally, Elwell challenges the testimony of Robert Ceberio, the former Executive Director of the Meadowlands Commission, regarding the power that individual towns retain over development projects within the Commission's jurisdiction. Specifically, Elwell contends that evidence of his own power and authority concerning the Commission is irrelevant and substantially prejudicial,[12] because "no evidence was presented that Dwek was ever made aware of" Elwell's authority over the Commission's

---

[12] The parties dispute whether Elwell made a Rule 403 objection at trial, and thus they disagree over the proper standard of review. Although the government is correct that Elwell did not expressly state that he was making a Rule 403 objection at trial, his explanation for the objection refers indirectly to the risk of prejudice. Accordingly, we review this claim under an abuse of discretion standard.

actions, and thus such power could not have played a role in Dwek's offering – or Ewell's accepting – the $10,000 payment. (Appellant's Opening Br. at 61.)

We disagree, and, on the contrary, consider Elwell's mayoral authority highly probative of his "inten[t] to be influenced" by the payment, which is an element of the offense for which he was convicted. *See* 18 U.S.C § 666(a)(1)(B) (making it a crime for an agent of the state to corruptly "accept[] … anything of value from any person, intending to be influenced" regarding government business). Regardless of whether Dwek was aware of the full scope of mayoral power, he made clear what he wanted in exchange for the payment, and Elwell's actual authority is directly relevant to whether Elwell accepted the payment with the intent to follow through on those requests. In fact, one of Elwell's primary defenses was that he could not have "intend[ed] to be influenced" because he had no authority to expedite Dwek's proposed development, an argument that is substantially undermined by Ceberio's testimony. *Id.* The evidence is therefore highly relevant and, while prejudicial to Elwell's case, is not unfairly so, and was thus properly admitted. *See United States v. Cunningham*, 694 F.3d 372, 390 (3d Cir. 2012) ("[A] party is not protected from all prejudice – only unfair prejudice.").

### B.    *Prosecutorial Misconduct*

In addition to the evidentiary issues he raises, Elwell argues that the government engaged in several forms of prosecutorial misconduct that require reversing his conviction and remanding for a new trial. Specifically, he maintains that during summation the government impermissibly presented a theory of "guilt by association," attacked Elwell's character for honesty, and implied that he colluded with his counsel to

14

lie to the jury.[13]  According to Elwell, the cumulative effect of those "purposeful and coordinated character attacks" deprived him of his right to a fair trial.  (Appellant's Opening Br. at 33.)  Because he only objected to the statements regarding collusion with counsel, we review that alleged misconduct for abuse of discretion but review the unraised claims for plain error.  *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

Improper prosecutorial conduct rises to the level of constitutional error when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding."  *United States v. Morena*, 547 F.3d 191, 193-94 (3d Cir. 2008) (internal quotation marks omitted).  To determine if that high standard is met, we first assess the prosecutor's allegedly improper actions, then consider "the weight of properly admitted evidence and any curative instructions given by the trial court."  *Id.* at 194.  During summation, a prosecutor "is entitled to considerable latitude" and may ask the jury to make "any reasonable inferences that can be drawn from the evidence."  *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991).  While the government is expected to "prosecute with earnestness and vigor" and "may strike hard blows," it is "not at liberty to strike foul ones."  *Morena*, 547 F.3d at 193 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)) (internal quotation marks omitted).

---

[13] Elwell reiterates many of his evidentiary concerns when describing the alleged prosecutorial misconduct.  As described above, however, all of the evidence that Elwell challenges was properly admitted, and therefore cannot be considered prosecutorial misconduct.  We do not readdress the admissibility of that evidence here, instead considering only Elwell's claims that the government improperly referred to that evidence during summation.

Here, none of the conduct that Elwell identifies was so improper, if improper at all, that it deprived him of a fair trial. Elwell's claim that the government impermissibly established his "guilt by association" is based largely on the prosecutor's following statement to the jury:

> Ladies and Gentlemen, Dennis Elwell was no babe in the woods. He was a savvy politician. He was a politician who had been in Hudson County for 17 years, a place where Ron Manzo told you, unfortunately, there is no stranger to corruption, a place where some of the highest-ranking people in Hudson County government, the county executive, the freeholders, have gotten into legal trouble for taking cash payoffs. This was the world that Dennis Elwell lived in in the summer of 2009.

(App. at 699.) According to Elwell, that declaration was the culmination of "the [g]overnment's carefully orchestrated stratagem to tar [him] as just another corrupt 'Hudson County' politician." (Appellant's Opening Br. at 34.) That statement, however, can be seen as directly addressing one of the only factual issues contested at trial: Elwell's intent in accepting Dwek's payment. Elwell's years of experience in politics and his knowledge of other politicians' problems with corruption undermine his argument that he thought the payment was a campaign contribution. Thus, while that statement may have been a hard blow to Elwell's case, it was not, under the specific circumstances here, a foul one, *Morena*, 547 F.3d at 193, and it certainly did not constitute a "manifest miscarriage of justice," *Brennan*, 326 F.3d at 182.

Elwell's second contention – that the government impermissibly attacked his character for honesty – fails for similar reasons. That claim relates to the prosecutor's comments about Elwell's bail violation, specifically the following rhetorical question

16

posed to the jury in summation: "Was [Elwell] an honest man when he violated the conditions of his bail, and he contacted Maddy Michaels, his former subordinate … and he said to her, you are going to be the [g]overnment's star witness against me[?]" (App. at 741.) Elwell insists that that statement is a "blatant misuse of the 404(b) evidence to improperly argue the bad character trait of dishonesty." (Appellant's Opening Br. at 47.) But, as described above, Elwell's character for truthfulness was at issue because he was a witness at trial. *See* Fed. R. Evid. 608(b). Moreover, Elwell's main argument was that he was an honest man who did not believe he was accepting a bribe, placing his truthfulness even more centrally at issue. *See United States v. Lore*, 430 F.3d 190, 213 (3d Cir. 2005) (holding it is not improper for a prosecutor "to focus the jury's attention on holes in the defense's theory" (internal quotation marks omitted)). That attack on Elwell's character for truthfulness therefore did not constitute prosecutorial misconduct.

Finally, Elwell argues that several references to interactions between him and his counsel were improper. Specifically, Elwell claims that the government improperly suggested that (1) he and his counsel colluded to pass off a different stack of $100 bills as the original $10,000 that he received from Dwek; (2) the defense took evidence out of context and tried to mislead the jury; and (3) he lied on the stand with the encouragement of counsel.

Although it is correct that "as a general rule, a prosecutor should refrain from attacking the integrity and ethical standards of defense counsel," *United States v. Pungitore*, 910 F.2d 1084, 1142 (3d Cir. 1990), none of Elwell's allegations of government misconduct in this regard rise to the level of a constitutional error. In fact,

17

his first contention is factually incorrect; although the government did suggest that the money Elwell returned might not have been the same cash that he received, it never alleged that defense counsel participated in that scheme.[14]

The second contention fails because it does not allege any unethical or improper conduct. Although prosecutors should refrain from attacking "the character of the attorneys themselves," there is "nothing improper" about "comments directed at the tactics and arguments advanced by defense counsel." *Lore*, 430 F.3d at 213. Here, the government's assertion that the defense's arguments were without proper context is simply an attack on the arguments.

Elwell's third assertion is less frivolous but still does not rise to the level of prosecutorial misconduct. Elwell takes issue with the government's statement that "when he was asked a difficult question," he "look[ed] over at the counsel table … as if he was looking for the right answer." (App. at 741.) Although that allegation could be construed as an attack on the character of the defense attorney, any risk of prejudice was mitigated by a curative instruction the Court issued to the jury, which explained that "[t]here is nothing in this case that would suggest that defense counsel in any way was acting improperly." (App. at 745.) *See United States v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010) (noting that jury instruction cured the risk of prejudice caused by an improper comment

---

[14] This first misconduct argument is based on Elwell's own testimony that he "learned from his counsel" that the FBI had recorded the serial numbers for only two of the bills that Dwek gave to Manzo. (Appellant's Opening Br. at 48.) He argues that because of that testimony, "the implication that counsel participated in Defendant's alleged 'replacement' of the money is inescapable." (*Id.*) We disagree. The inference that defense counsel knowingly participated in a fraudulent scheme is not logically supported by Elwell's testimony, and is certainly not an "inescapable" conclusion. (*Id.*)

because "juries are presumed to follow their instructions"). Thus, the District Court did not err in dismissing Elwell's motion for a new trial or judgment of acquittal.

## III. Conclusion

For the forgoing reasons, we will affirm the judgment of the District Court.