NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1875
_____

UNITED STATES OF AMERICA

v.

FUHAI LI,

Appellant
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 3-16-cr-00194-001)
District Judge: Honorable A. Richard Caputo
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 14, 2020

Before: AMBRO, JORDAN and SHWARTZ, Circuit Judges

(Opinion filed: July 9, 2020)

_____

OPINION[*]
_____

AMBRO, Circuit Judge

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

A jury convicted Fuhai Li, a doctor, for the unlawful distribution and dispensing of controlled substances, distribution to a pregnant woman, distribution resulting in death, maintaining drug-involved premises, money laundering, and tax evasion. Li appealed, alleging insufficiency of the evidence, improperly admitted evidence and expert testimony, and errors in the jury instructions and the calculation of forfeiture. As all the claims fail, we affirm Li's convictions.

## I. Factual and Procedural Background

Li ran Neurology and Pain Management, a medical practice in Milford, Pennsylvania. He made prescription Schedule II narcotics easily available to those who sought them—persons in severe pain (who ultimately developed addictions), ongoing addicts, and those involved in the illegal resale of the controlled substances. By 2013 Li was one of the highest prescribers of oxycodone and other controlled substances in the Commonwealth.

Li generally required immediate cash payments for his visits. His patients paid $250 to $350 for an initial visit, and $150 for monthly visits thereafter. These visits were often brief and Li's medical examinations superficial. Some patients testified that they received prescriptions for high dosages of oxycodone or other opioids without sharing their prior medical records or even their medical history. At follow-up visits, Li's patients often simply asked for higher doses of narcotics, and he would write the prescription accordingly. He also continued to write scripts for patients who admitted to taking more pills than prescribed, and increased dosages even though patients reported

2

stable conditions. Li falsified his patients' medical records, including medical exams that were never performed and billing health insurers for these tests.

Li's conduct ultimately did not go unnoticed. His patients called his practice to complain when pharmacies stopped filling their prescriptions. Li's receptionists directed them to specific pharmacies where Li had pre-existing relationships. At trial, Robert Welsh, a pharmacist, explained that Li's patients exhibited "all [the] textbook flags that . . . you should not fill the prescription." S.A. 272. Thus, abiding by his professional obligation not to fill what appeared to be unlawful prescriptions, he turned Li's patients away. The testimony of other pharmacists corroborated his view. They noted that Li's patients tended to present prescriptions for large quantities of pills at the maximum dosage, were unwilling to present photo identification, often traveled long distances to obtain the drugs, and preferred to pay in cash. Further, when these pharmacists attempted to verify prescriptions with Li's office, they often faced roadblocks, such as the office's refusal to provide a diagnosis for the prescription, reliance on the same diagnosis for many patients, or even being told "if you don't want to fill it, don't fill it." S.A. 274.

Two of Li's patients were key to the charges in this case: Rachel Scarpa and Suzanne Maack. Li began treating Ms. Scarpa for neck pain in January 2013. In March 2014 he wrote her a prescription for 120 30-milligram oxycodone pills after being warned twice by his staff that she was visibly pregnant. Per Li's records, she had gained 40 pounds over eight months. At trial, Li testified that he just thought Ms. Scarpa had gotten fat. Eleven days later, she gave birth to a full-term, opioid-dependent baby.

3

Li treated Suzanne Maack for the first time two days before she died from an overdose of Oxycodone. Ms. Maack's husband testified that Li's initial exam of his wife was cursory and ignored all signs of her psychiatric disorders, drug addiction, and suicidal history. At the end of the appointment, Li wrote Ms. Maack a prescription for 120 15-milligram oxycodone pills. She overdosed and died after taking approximately 42 pills the next evening.

At trial, the jury also heard from Dr. Stephen Thomas, the Government's expert. He discussed the medical standards for pain management and the evidence of medically illegitimate prescribing practices found in each of the thirty-seven patient files he reviewed. He noted that Li failed to collect adequately new patients' medical history, regularly prescribed the highest dosage of highly addictive opioid medication at the very first visit, failed to establish that there were medically legitimate reasons for those prescriptions, wrote prescriptions when faced with evidence of drug abuse and addiction disorders, and engaged in sexual activity and other sexually inappropriate conduct with at least three patients for whom he wrote prescriptions.

In January 2015 the Government seized approximately $1,030,960 in cash from Li's townhouse in Milford and home in East Stroudsburg, PA, and $1,073,446 from his bank accounts. The IRS determined that his medical practice failed to report $832,980.45 in income between 2011 and 2013. Evidence showed Li, who was responsible for all aspects of his pain management business, provided his accountant with records of his patients' medical histories, lab results, appointments, and payment histories that differed significantly from those in his "eClinical" software. Further, after the Government

4

conducted search warrants for Li's records, he adjusted his 2014 taxes to reflect this additional income and asked his accountant to amend his returns from prior years.

After the Government concluded its case at trial, Li made an oral motion for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(a), asserting that there was insufficient evidence to show he committed any of the charged crimes, which the District Court denied. At the conclusion of the nineteen-day trial, the jury convicted Li of twenty-three counts of federal violations for unlawful distribution and dispensing of a controlled substance, unlawful distribution and dispensing of a controlled substance resulting in death, unlawful distribution and dispensing of a controlled substance to a pregnant individual, maintaining a drug-involved premises, money laundering, and tax evasion.[1] After forfeiture proceedings before the jury, it returned a special verdict form finding that the cash seized from Li's bank accounts and his home, totaling over $2 million, was forfeitable because the monies had a nexus to his drug-distribution convictions, drug premises convictions, and/or money laundering convictions.

The District Court sentenced Li to 330 months' imprisonment, to be followed by a six-year term of supervised release, $3,000 in special assessments, and $5,177.80 in restitution. *United States v. Li*, No. 3:16-cr-00194-ARC, 2019 WL 1877561, at *1–2, 4 (M.D. Pa. Apr. 4, 2019). He appeals his convictions.

---

[1] Before resting its case, the Government moved to withdraw Counts 18 and 21 (related to two of Li's patients), which the District Court granted.

## II. Discussion[2]

Li raises five issues on appeal. We consider each in turn.

### i.

Li prescribed Ms. Maack oxycodone two days before she died of an overdose from taking 42 pills. Based on testimony regarding this event, the jury convicted Li of unlawful distribution and dispensing of a controlled substance under 21 U.S.C. § 841 and applied the "death enhancement" pursuant to § 841(b)(1)(C), which imposes a 20-year mandatory-minimum sentence. Li asserts that the trial evidence was insufficient to prove Ms. Maack's prescription was outside the course of professional conduct. We disagree.

We review sufficiency-of-the-evidence challenges under a "particularly deferential standard" and "must sustain the jury's verdict 'if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (*en banc*) (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)). The evidence submitted at trial was sufficient for a "rational trier of fact" to find "proof of guilt beyond a reasonable doubt." *Id.* (alteration and citations omitted). Ms. Maack's husband, who accompanied her in the examination room, testified to the cursory nature of her first and only appointment with Li. He did not review Ms. Maack's medical history, even though she provided her medical records prior to her visit, nor did he discuss the nature of the prescribed narcotics with her. Further, Li ignored that her urine screen was positive for

---

[2] The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

6

oxycodone, though she did not report taking that drug. **S.A. 2301–02.** Dr. Thomas carefully examined Ms. Maack's medical records from her visit with Li and testified that in his expert opinion Li's prescription was outside of the scope of professional practice in light of her urine screen, psychiatric history, and suicidal ideation. **S.A. 2308.** A rational jury could have credited this testimony and found that she was prescribed opioids outside the course of professional conduct.[3]

ii.

Next, Li claims that the District Court improperly admitted evidence of his prior bad acts in the form of testimony of pharmacists and patients not specifically identified and charged in the superseding indictment, violating Federal Rule of Procedure 404(b). As Li did not object to the introduction of this evidence in front of the District Court, we review his claim for plain error. *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010). Thus, we will only reverse if there was an error that was obvious, it affected Li's substantial rights, and if not addressed, "it would seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal citation omitted).

Federal Rule of Evidence 404(b) prohibits district courts from admitting "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

---

[3] Li also argues, for the first time on appeal, that Ms. Maack's death could have been a suicide. This assertion is not relevant to our inquiry. "The Government was not required to prove . . . that oxycodone was [Maack's] *only* cause of death. On the contrary, but-for causation exists where a particular controlled substance—here, oxycodone—'combines with other factors' . . . to result in death." *United States v. Volkman*, 797 F.3d 377, 395 (6th Cir. 2015) (citation omitted).

"Rule 404(b) 'does not extend to evidence of acts which are 'intrinsic' to the charged offense.'" *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) (quoting Fed. R. Evid. 404(b) advisory committee's note). "[A]cts are intrinsic when they directly prove the charged" offense. *See id.* In *United States v. Gibbs* we explained that such proof "may be extremely prejudicial to the defendant but the court would have no discretion to exclude it because it is proof of the ultimate issue in the case." 190 F.3d 188, 218 (3d Cir. 1999) (citation omitted).

There is no question that testimony was introduced for a non-propensity purpose. The Government used the pharmacists' testimony that they had repeatedly called Li to question his prescriptions to show he knew he was prescribing pills outside the course of professional practice.

Further, testimony from former patients was offered to prove that Li maintained drug-involved premises in violation 21 U.S.C. § 856(a) (Counts 26 and 27), which requires the Government to show that he "knowingly open[ed], lease[d], rent[ed], use[d], or maintain[ed] any place . . . for the purpose of . . . distributing . . . any controlled substance." Take as an example Brian Gilson's testimony. He stated that Li increased his dosage of oxycodone without his asking, and when he admitted to taking more pills than prescribed, Li increased the dosage again. Li saw Gilson and his mother at the same time in the same examination room, writing oxycodone prescriptions for both of them. By his third visit to Li's office, Gilson was addicted to opioids, and after he was discharged as a patient, he turned to injecting heroin and spent a few months in prison. Gilson's testimony demonstrates that Li acted more like a drug dealer—creating and

8

feeding addictions—than a pain management doctor. This was not Rule 404(b) evidence, and the District Court properly admitted it.

Nor was evidence of Li's patients' addictions, withdrawal symptoms, and criminal actions unfairly prejudicial, and thus inadmissible under Federal Rule of Evidence 403. Testimony from patients like Gilson revealed that Li's prescriptions were subject to abuse. Given the charges in this case and Li's testimony that he prescribed controlled substances for a lawful medical purpose, this evidence was relevant to show that his treatment was outside the course of professional practice. *See United States v. Kirk*, 584 F.2d 773, 778 (6th Cir. 1978) (affirming the admission of allegedly "prejudicial" evidence of "drug use and sales" when relevant to the crimes charged). Thus, any prejudice this evidence caused was due to its inherent relevance and did not "cloud[]" the jury's "impartial scrutiny and reasoned evaluation of the facts," as Rule 403 requires for exclusion. *See United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (citation omitted).

### iii.

Li also questions the reliability of Dr. Thomas's expert testimony, arguing it was based on subjective belief and questionable methodology. We review the District Court's evidentiary decisions for an abuse of discretion. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 738 (3d Cir. 1994). The Court held a *Daubert* hearing on May 1, 2018, and

determined that Dr. Thomas's testimony, which heavily referenced medical guidelines, met Federal Rule of Evidence 702's requirements.[4] We agree.

Rule 702 has a "liberal policy of admissibility." Under it, "the process or technique the expert used in formulating the opinion [must be] reliable." *Id.* at 741. "[T]he standard for determining reliability is not that high." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) (internal quotation marks and citation omitted). Expert testimony may be based on one's personal knowledge or experience, and in those circumstances the District Court may inquire into whether the expertise is based on generally accepted methods and training. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999).

Dr. Thomas drew on his thirty years of experience as a pain management doctor to reach his conclusions. In addition, he based his testimony on reliable and generally accepted techniques—*i.e.*, numerous pain management medical studies, as well as state policies and regulations, such as the Federation of State Medical Boards Model Policy and the Pennsylvania Code. As Dr. Thomas's testimony met the flexible *Daubert* factors for reliability and we give the District Court "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co.*, 526 U.S. at 152, the Court did not abuse its discretion when it allowed Dr. Thomas to testify as an expert witness.

iv.

---

[4] At the conclusion of the *Daubert* hearing, Li conceded the relevance and fit prongs of *Daubert*, so we only review whether Dr. Thomas' testimony was reliable. *See United States v. James*, 955 F.3d 336, 345 (3d Cir. 2020) (holding that when a defendant states that he has no objection to the introduction of evidence he waives the right to any appellate review of the admission of such evidence).

Nor did the District Court err when it declined to instruct the jury that Li could not be found guilty if the jury determined he acted in good faith. "We review the refusal to give a particular instruction or the wording of instructions for abuse of discretion." *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006), *abrogated on other grounds by Loughrin v. United States*, 574 U.S. 351 (2014). It is settled law that "a district court does not abuse its discretion in denying a good faith instruction where the instructions given already contain a specific statement of the government's burden to prove the elements of a 'knowledge' crime." *Id.* at 651. Here the District Court instructed the jury on the requirements to prove knowledge. Thus it acted within its discretion.

v.

Finally, Li appeals the District Court's forfeiture order. Insofar as he contends that the Court should have held a fact hearing to determine the amount of forfeiture, we disagree. The Court held a bifurcated forfeiture trial. After returning a guilty verdict, the jury heard additional evidence regarding the sources of funds in Li and his family's various bank accounts before being asked to determine whether these assets had a sufficient nexus to the events giving rise to the forfeiture allegation. *See* Fed. R. Crim. P. 32.2(b)(5)(B) (providing that the jury may decide forfeiture by completing "a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant"). Both Li and the Government had the opportunity to address the jury during this portion of the trial. Li does not explain why this process was inadequate. As he had the opportunity to present his case to the

11

jury, the Court did not err by entering the forfeiture order without additional process. *See* Fed. R. Crim. P. 32.2(b)(2)(A) (instructing courts to "promptly enter a preliminary order of forfeiture" after a finding that property is subject to such forfeiture).

Insofar as Li argues that the Government failed to prove that he derived all of the forfeited funds from criminal activity, we also disagree. The jury was properly instructed that property is subject to forfeiture if the Government proves by a preponderance of the evidence that it was derived from proceeds Li obtained directly or indirectly from his offenses of conviction, or the property was used in part to facilitate the commission of those offenses. *See United States v. Lacerda*, 958 F.3d 196, 217 (3d Cir. 2020) (affirming forfeiture of all a business' proceeds when the district court found that the business "was a fraudulent enterprise from beginning to end"); *United States v. Sanders*, 952 F.3d 263, 285–86 (5th Cir. 2020) (collecting circuit cases upholding "forfeiture where there's evidence of pervasive illegality at the institution." (citation omitted)). As Li was convicted of maintaining drug-involved premises and all of the forfeited funds were tied to them, we cannot say that the jury erred in its forfeiture determination.

\* \* \* \* \*

Thus we affirm.

12